THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JULIO FIGUEROA MUÑOZ, Defendant and Appellant.

No. 16511.    Decided June 26, 1963.

*Guillermo S. Pierluissi* for appellant. *J. B. Fernández Badillo,*
*Solicitor General,* and *Rodolfo Cruz Contreras, Assistant*
*Solicitor General,* for The People.

Division composed of Mr. Justice Belaval, as Chief Judge of
Division, Mr. Justice Hernández Matos, and Mr. Justice
Santana Becerra.

PER CURIAM: Appellant was convicted by a jury of murder
in the second degree. In his appeal he assigns the following
errors:

(a) That the court "committed grave error in per-
mitting the introduction in evidence, through the testi-
mony of witness José A. Nazario, Lieutenant of the
State Police, who intervened with him in the investiga-
tion, of a series of alleged admissions by defendant's
conduct, obtained by means of psychological coercion and
illegal arrest by the district attorney himself, alleged
admissions by conduct which tended to impress the jury
against defendant, and above all, when the district attor-
ney's conduct in obtaining said admissions by means of an
illegal examination of defendant in the course of the
investigation violated defendant's constitutional right of
not being compelled to be a witness against himself."

In addition to the admissions mentioned in the pre-
ceding assignment of error, the court admitted in evidence,
with defendant's affirmative approval, his first sworn state-
ment, where he stated the following:

"I returned from Sábana Llana and went on directly, without entering the bar, to Luquillo for the purpose of taking home the boy who was with me, called Félix López, who lives in Luquillo beach and who is the person who fells and gathers the coconuts for me. It was about 8:00 p.m. when I arrived at Luquillo and here I met Jesús Suárez and Rafael Escobar at a bar called Los Mangos; I stayed with them for some time and we drank some beer; we left there a little after twelve and went straight to my business place; there the three of us were drinking until three o'clock in the morning more or less, and then they left, and Ana Angélica and I were left alone in the bar; I started to close the business and she began to balance the cash; after we had finished and were ready to leave, I invited her to a beer; she was lying on a hammock while drinking the beer and then she got up and as she walked towards the canteen, she fell down and hit against the counter; then I took her and sat her on a cardboard box that was nearby; I stayed for a while with her, and called her, but she did not answer; when I noticed that she was dead I went for her relatives and then I had an accident at the crossing in Isla Verde. I left my bus because a man seized my key and went on to notify her relatives. I went with this man here, whose name I know now is Ramón Jiménez González, and notified them. Her sister came with me; then I went for the doctor and he ordered the lifting of the body and its transfer to the funeral home. The doctor who ordered the lifting of the body was Dr. Robles, who worked in the Canóvanas Municipal Hospital.

"DISTRICT ATTORNEY: Julio, on March 18, 1957 did you have any argument with Angelina Vélez Sánchez?

"WITNESS: I had no argument with her on the day prior to her death nor did she tell me of any suicidal intent. That for the past four or five months I was living with her and we were in good terms. I do not know the cause of her death."

By stipulation of the parties the written sworn statement of the victim's sister was admitted, where she states that on Tuesday, March 19, 1957, about 8:30 a.m. appellant Julio Figueroa Muñoz, who lived maritally with her sister Ana Angélica Vélez Sánchez, arrived at her house; that she asked what was the matter and Julio Figueroa Muñoz was crying

and could not explain to her; that they went to Bar Camarero and when they arrived there Julio started to cry; that on the way the latter had told her that "during the night when he was going to close the business, Ana Angélica was sitting in a hammock and that he had invited her to drink the last beer before closing, and when she was going to serve the beer, she collapsed. That he picked her up and sat her on some boxes that are behind the counter. There I found her, seated on a box and leaning against other boxes stored nearby. I became nervous and started to cry and Julio started to cry also, and he said: 'Angélica, Angélica, you will answer me no more.' Meanwhile, a boy called Arturo, who had come with me, asked what we were going to do, whether he should go for the doctor and I answered him affirmatively and he went for the doctor. Meanwhile, Julio was saying: 'Maybe they will think I killed her.' He also said: 'What will Eduardo say when he knows about this.' Eduardo is my brother. In the meantime the doctor arrived and she was taken from the boxes where she was and put on a stretcher, and as Julio was crying the doctor said: 'Do not worry for you are not responsible for that.' Then the police arrived and the ambulance had already taken Ana Angélica away."

The next day, after a series of events had taken place, among them defendant's continuous detention and his confrontation with Ana Angélica's corpse so he could see the violent injury she had in the center of her skull with comminuted fracture, defendant gave a second statement which he did not sign and which the court refused to admit in evidence. Through Lieutenant Nazario's testimony, who was present when defendant was giving said second statement, the district attorney introduced evidence of what defendant had stated. The Lieutenant said that defendant had stated in said second occasion that he had not drunk any beer in his business until two or three o'clock in the morning, when he drank with some friends in bar Los Mangos. That after his

friends left he stayed with his employee Ana Angélica Vélez only, and after balancing the cash and getting ready to leave he invited her to a beer "and that when she got up from a hammock to get the beer, when reaching the counter she collapsed; it seems she fainted and he grasped her and helped her till he sat her on some cardboard boxes which were inside, at the entrance of the bar."

Evidently defendant's second statement brought to the record by way of admission does not differ substantially from his previous statement which was admitted with his express acceptance. However, we have carefully examined the record and there is no ground to conclude that defendant was a victim of psychological coercion according to the facts that occurred prior to his second statement. We have also examined the situation as to whether he was compelled to be a witness against himself or whether in any way his right to remain silent was improperly used, in the light of our recent decision on the matter in *People* v. *Álvarez*, 85 P.R.R. 569 (1962), and we do not believe that defendant's constitutional rights were violated or that his conviction, considering the record as a whole, was the result of an unfair trial.

■ The second assignment of error attacks the admission of Doctor Bolívar Patiño Arca's testimony in the trial as to the result of the post-mortem examination performed on the victim, on the ground that the diligence and care taken with the corpse were not previously established. Dr. Patiño testified in detail as to the external conditions of the corpse and said that it did not show any sign of violence, except for the discovery of an invisible injury on the skull. The record shows that a death certificate was immediately issued for unknown cause and the corpse was taken to a funeral home. As the investigation progressed the transfer of the corpse to Fajardo District Hospital was ordered where the autopsy was performed. These circumstances did not render

inadmissible at law the doctor's testimony as to the autopsy, aside from the fact that no objection was made to said testimony.

■ In the third assignment certain instructions considered ambiguous, confused and inaccurate are challenged. The instructions challenged are the following: "if the gentlemen of the jury believe, from the result of the evidence, *beyond any reasonable doubt*, that no crime has been committed in this case, or that it has not been amply justified that the death of Ana Angélica Vélez was the result of any action whatsoever on the part of defendant; or if they believe that his culpability has not been duly proved, or if they have any doubt whatsoever, a reasonable and well founded doubt, then, in any of these cases, the jury should not find defendant guilty."

We agree that the judge should not have inserted the phrase we have underscored in that place, but it could not have prejudiced defendant, nor is it a ground for reversal, if the instructions are considered as a whole, it being a fact that in addition to the matter previously quoted the judge gave ample and complete instructions as to reasonable doubt, defendant's presumption of innocence, and the duty of The People to prove the case beyond any reasonable doubt. Any momentary danger, if any, was immediately dissipated at the end of the above-copied instruction.

■ The fourth assignment raises the point that the jury was not given instructions on homicide. Apart from the fact that said instructions were not requested, if said omission would constitute a fundamental and prejudicial error to defendant we would not hesitate to consider it and reverse the judgment. The only direct evidence as to how the death occurred as well as all the other circumstances appearing in the record is no ground for instruction for homicide. *Cf. People* v. *Cortés*, 79 P.R.R. 769 (1957).

■ In the fifth assignment the reversal of the judgment is requested because the jurors were not asked whether they had been convicted of felony. The record before us does not contain the incidents as to the drawing and qualification of the jury. We cannot determine whether such question was not asked and even though it were not asked, we cannot presume that a person convicted of felony served in the jury. If that was the situation defendant should have raised the question in the trial court, at least in a motion for a new trial, where the facts could have been elucidated. Said error is not reversible. *Cf. People* v. *Ramírez*, 50 P.R.R. 224, 263–265 (1936).

■ In this case of circumstantial evidence the jury had before it a version of how the death occurred, said version having been presented by The People through the testimony of defendant himself in his written statement, and it also had before it all the other circumstances tending to prove that there was a violent death from a criminal hand. Among said circumstances is the violent blow that the victim had in the center of her head, which caused the comminuted fracture of the skull and hemorrhage, which blow, according to the doctor, must have been inflicted with a contusive instrument, with great force, and which could not be caused by the victim's fall as a consequence of a syncope or a fainting spell, even if upon falling she should have struck against something. The jury weighed the evidence and, with clear and correct instructions, reached the conclusion that defendant was guilty of the offense.

The judgment appealed from will be affirmed.